# EMPLOYMENT AGREEMENT

This Agreement entered into as of January 1, 2023, is between Hutson, Inc., a Kentucky corporation ("Company"), and Joshua Waggener ("Employee").

Employee is currently employed by Company on an at-will basis for an indefinite term, based on the Parties mutual agreement that has not been reduced to writing. However, the Parties now wish to enter into this written Agreement which as of the Effective Date, will govern the Employee's employment with Company.  This Agreement is ancillary to and contingent upon the Employee signing and agreeing to be bound to the terms of a certain Agreement to Protect Confidential Information, Assign Inventions and Prevent Unfair Competition and Solicitation ("Restrictive Covenant Agreement") also dated January 1, 2023.

1. **Appointment**.  Employee shall serve as Hutson, Inc.'s Chief Executive Officer or in such position(s) as the Board of Directors of Hutson, Inc., (the "Board") shall in its sole discretion designate from time to time, although a change in position will be grounds for Employee to terminate his employment for Good Reason as provided in Section 8(e).  Employee agrees to be a loyal employee of the Company, and shall at all times faithfully and to the best of Employee's abilities and experience, and in accordance with the reasonable standards and ethics of the business in which Company is engaged, perform all duties that reasonably may be required of Employee by this Agreement, Company's policies and procedures, and the reasonable directives of the Board subject to the terms of this Agreement.  Employee agrees to devote such working time and efforts (except for permitted vacation periods and reasonable periods of illness and other incapacity) to the performance of services, duties and responsibilities on behalf of Company so that such performance shall be his primary business activity.  Employee may serve on the boards of directors of a reasonable number of corporations or trade organizations and participate in charitable, community or religious activities; provided, however, that in the opinion of the Board, such service or participation does not materially interfere with the proper performance of his duties and responsibilities specified herein.

2. **Compensation**.



3. **Fringe Benefits**.

    a. **Insurance**. Employee and Employee's dependents shall be eligible for coverage under the group insurance plans made available from time to time to Company's executive and management employees. The premiums for the coverage of Employee and Employee's dependents under that plan shall be paid pursuant to the formula in place for other executive and management employees covered by Company's group insurance plans.

    b. **Travel Reimbursements**. Company shall reimburse Employee for business travel that Employee conducts in Employee's personal vehicle at the same rates as are set from time to time by the Company for business travel by its executive and management employees. Company shall provide Employee with a Company-paid automobile for Employee's business and personal use comparable to the automobile the Company provided Employee for use immediately prior to the Effective Date or such other automobile that may be approved the Board in its sole discretion and shall reimburse Employee's insurance and routine maintenance and reasonable upkeep costs for such automobile.

    c. **Expenses**. Subject to Company's policies and procedures for the reimbursement of business expenses incurred by its executive and management employees, Company shall reimburse Employee for all reasonable and necessary expenses incurred by Employee in connection with Employee's performance of Employee's duties under this Agreement; provided Company shall in all cases have the right to require Employee to document, in a manner reasonably satisfactory to Company, all expenses for which Employee seeks reimbursement under this paragraph.

    d. **Miscellaneous Benefits**. Employee shall receive all fringe benefits that the Company may from time to time make available generally to its executive and management employees.

4. **Paid Leave**.

    a. **Annual Absences**. Employee shall self-manage his absences in accordance with Hutson's policy. Employee acknowledges that Hutson's self-managed absence program is a benefit that affords him flexibility in scheduling his time off as needed instead of accruing an eligible number of days per year. Notwithstanding anything to the contrary contained in this Agreement, any unused Annual Absence time is forfeited upon the termination of Employee's employment.

    b. **Sick Leave and Holidays**. Employee shall receive paid sick leave and holidays under the guidelines for such leave applicable from time to time to Company's executive and management employees.

---

[1] Note that this is an estimated amount only based upon Hutson internal LTIP models provided in December, 2022, and is subject to being changed once audited financial statements for tax year 2022 have been finalized and final calculations are made in accordance with the definitive LTIP agreements.

**5.**     **Conflicting Activities**.  During the term of this Agreement, Employee shall not engage in any activity that conflicts with, appears to conflict with, or is detrimental or appears to be detrimental to Company's best interests, as determined by Company in its sole discretion.

**6.**     **Confidentiality**.  During and after the term of this Agreement, Employee shall not disclose any term of this Agreement to any person or entity, except that Employee may disclose any such information as required by subpoena or court order, or to an attorney or tax or financial adviser to the extent necessary to obtain professional advice.  In addition, Employee may disclose such information to members of Employee's immediate family.

**7.**     **Relationship Between this Agreement and Other Company Publications**.  In the event of any conflict between any term of this Agreement and any Company contract, policy, procedure, guideline or other publication, the terms of this Agreement shall control.

**8.**     **Term and Termination**.

   **a.**     **Term**.  The initial term of this Agreement shall commence on the Effective Date and extend until December 31, 2023, unless terminated earlier pursuant to the terms herein ("Initial Term").  The term of this Agreement shall automatically renew for successive one (1) year periods (each a "Renewal Period") unless either party provides ninety (90) days advance written notice prior to the end of the Initial Term or any Renewal Period, as may be applicable, to the other party.  The Initial Term, together with any Renewal Periods, shall be defined as the "Term" of this Agreement.  For the avoidance of doubt, any decision by the Company not to renew this Agreement at the end of the Initial Term or any Renewal Period shall constitute a termination without Cause under Section 8(f) of this Agreement and likewise, any decision by Employee not to renew this Agreement at the end of the Initial Term or any Renewal Period shall constitute a termination for Good Reason under Section 8(e) of this Agreement.

   **b.**     **Termination by Consent**.  This Agreement may be terminated at any time by the parties' mutual agreement, expressed in writing, with Company's only obligation being the payment of (i) earned, unpaid salary through the date of termination, payable within the timeframes required by applicable law but in no event later than thirty (30) days following the date of termination, (ii) accrued, unused vacation compensation, in accordance with Section 4(a) above, through the date of termination payable within the timeframes required by applicable law but in no event later than thirty (30) days following the date of termination, and (iii) any bonus earned for a the fiscal year immediately preceding the year in which termination occurs that is not yet paid on the date of termination payable on the date that such bonuses are otherwise paid to Company employees and (iv) any bonus earned for the fiscal year in which termination occurs on a pro-rata basis depending on when the termination occurs during the course of that year (for the avoidance of doubt, if termination occurs halfway through the year, then Employee would be entitled to one-half of the bonus for that year) (Section 8(b)(i) through (iv), the "Accrued Obligations") and without liability for severance compensation of any kind.

   **c.**     **Termination by Death**.  Upon the death of the Employee, this Agreement shall automatically terminate, and all rights of the Employee and his heirs, executors and administrators to compensation and other benefits under this Agreement only shall cease, except for the payment of the Accrued Obligations and Company shall have no liability for severance compensation of any kind.

        d.      **Termination by Disability**. This Agreement shall terminate, consistent with applicable law, upon the Disability (as defined below) of Employee. If this Agreement is terminated for any reason set forth in this Section 8(d) then Company's only obligation under this Agreement shall be the payment of the Accrued Obligations and Company shall have no liability for severance compensation of any kind. For purposes of this Section, "Disability" shall mean that Employee, due to physical or mental illness, becomes incapable of performing the essential functions of his position, with or without reasonable accommodation, for 180 days in the aggregate during any period of twelve (12) consecutive months.

        e.      **Termination by Employee**. Employee may in Employee's sole discretion terminate this Agreement upon ninety (90) days' prior written notice to the Company. If Employee terminates this Agreement without Good Reason (as defined below), Company's only obligation under this Agreement will be the payment of the Accrued Obligations and the Company shall have no liability for severance compensation of any kind. If Employee terminates this Agreement for Good Reason, in addition to the aforementioned payments, and contingent upon Employee's (x) execution and delivery of a legal release drafted so as to ensure a final, complete and enforceable release of all claims that Employee has or may have against Company relating to or arising in any way from Employee's employment with Company and/or the termination thereof and such release becoming effective and irrevocable within fifty-five (55) days of such termination of employment (such requirement, the "Release Requirement"), (y) continuing to maintain complete and continuing confidentiality of Company's proprietary information and trade secrets, the circumstances of Employee's separation from Company, and compensation received by Employee in connection with that separation (such requirement, the "Confidentiality Requirement") and (z) continued compliance with the material terms and restrictions of the Restrictive Covenant Agreement, Company shall pay Employee all separation benefits required by the following Section 8(f), as if Employee had been terminated by Company without Cause. For purposes of this Agreement, "Good Reason" shall mean any reduction in Employee's base compensation unless agreed to in writing by Employee; provided that, for Good Reason to exist, written notice must be provided to the Company within 30 days of the date Employee has actual knowledge of the circumstances giving rise to Good Reason and, if the Company fails to cure such circumstances, Employee must terminate employment within 65 days of the date the Company's cure period expires.

        f.      **Termination by Company Without Cause**. Company may in its sole discretion terminate this Agreement at any time without Cause (as defined below). If Company does so, then in addition to payment of the Accrued Obligations and contingent upon Employee's satisfaction of the Release Requirement, the Confidentiality Requirement and continued compliance with the material terms and restrictions of the Restrictive Covenant Agreement, Company shall pay Employee severance compensation for thirty-six (36) months ("Severance Period"), with Employee receiving 100% of Employee's then-current base salary under paragraph 2(a) above during the first twelve (12) months and 50% of Employee's then-current base salary under paragraph 2(a) above for the next twenty-four (24) months, payable as part of the Company's regular payroll cycle, less customary or legally required withholdings ("Severance Payments"); provided that, Employee shall forfeit any right to severance payments under this Agreement if Employee fails to satisfy the Release Requirement; <u>provided further</u>, that, if Employee fails to satisfy the Release Requirement, Employee shall repay all such severance payments paid by the Company contingent upon the Employee's satisfaction of the Release Requirement and such repayment shall occur within sixty (60) days of the date the applicable severance payment is paid by Company. Employee shall also be paid the *pro rata* portion of Employee's bonus based on the amount of income at that specific time in the year under Section 2(b) above, if any, based on the number of days worked in the calendar year by Employee prior

to termination, payable on the date that bonuses for the fiscal year in which Employee's termination was effective. However, no bonus is payable for the Severance Period.  If Company terminates this Agreement at any time without Cause under this subparagraph, pays Employee all salary and vacation compensation earned and unpaid as of the termination date, and offers to pay Employee Severance Payments in the amount and on the terms specified above, Company's acts in doing so shall be in complete accord and satisfaction of any claim that Employee has or may at any time have for compensation or payments of any kind from Company arising from or relating in whole or part to Employee's employment with Company and/or this Agreement. If an Employee leaves anytime during the year, then the Severance Payments will begin as of time when the Employee's employment ends.

        **g.**      **Termination by Company for Cause**. Company may terminate this Agreement effective immediately, for "Cause," with Company's only obligation under this Agreement being the payment of the Accrued Obligations and the Company shall have no liability for severance compensation of any kind, if Employee: (i) is convicted or pleads no contest to a felony or any other crime involving intentional and actual fraud with respect to the Company, (ii) engages in material willful misconduct with respect to Employee's performance of his employment duties to the Company, (iii) engages in conduct causing the Company material financial harm, (iv) commits any material breach of any non-compete covenant (including any such material breach of the Restrictive Covenant Agreement to which Employee is party) between Employee and the Company or (v) substantially fails to perform duties of the office held by Employee as reasonably directed in writing by the Board; provided that Cause shall not exist in the case of clauses (ii), (iii), (iv), or (v) unless and until Company has given written notice to Employee detailing the alleged grounds for Cause and such grounds remain uncured 20 business days thereafter. Company acknowledges that Employee's failure to meet established performance goals or criteria shall not constitute evidence of "Cause" for purposes of this paragraph.



---

[2] Note that this is an estimated amount only based upon Hutson internal LTIP models provided in December, 2022, and is subject to being changed once audited financial statements for tax year 2022 have been finalized and final calculations are made in accordance with the definitive LTIP agreements.

**9. Successors and Assigns**.  Company, its successors and assigns may in their sole discretion assign this Agreement to any person or entity, with or without Employee's consent. This Agreement thereafter shall bind, and inure to the benefit of, Company's successor or assign. Employee shall not assign either this Agreement or any right or obligation arising thereunder. This Agreement shall also bind, and inure to the benefit of, the Employee's trusts, personal representatives and heirs.

**10. Notices**.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Non-Competition Agreement shall be in writing and shall be deemed to have been given or made (a) when delivered personally to the recipient, (b) when emailed to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if emailed before 5:00 p.m. prevailing Central Time on a business day, and otherwise on the next business day, or (c) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid), addressed as follows or to such other address or addresses of which the respective party shall have notified the other in writing:

        Company:        Hutson, Inc.
                              Attn:  Bruce L. Hahn, Vice President
                              306 Andrus Drive
                              Murray, KY 42071
                              Facsimile: (270) 964-0013

        with a copy to:        Miller Hahn, PLLC
                              Attn: Bobby R. Miller, Jr., Esq.
                              2660 West Park Dr., Ste. 2
                              Paducah, KY 42001
                              Facsimile: (866) 578-2230
                              bmiller@millerlaw-firm.com

        Employee:        To the address listed on the signature page hereto.

**11. Miscellaneous**.

        **a. Governing Law**.  This Agreement, and all other disputes or issues arising from or relating in any way to Company's relationship with Employee, shall be governed by the internal laws of the Commonwealth of Kentucky, irrespective of the choice of law rules of any jurisdiction.

        **b. Disputes**.  Any action arising from or relating any way to this Agreement, or otherwise arising from or relating to Employee's employment with Company, shall be tried only in the state or federal courts situated in McCracken County, Kentucky WITHOUT THE BENEFIT OF TRIAL BY JURY. The parties consent to jurisdiction and venue in those courts to the greatest extent possible under law.

        **c. Delivery by Electronic Means**.  This Agreement, to the extent signed and delivered by means of a facsimile machine or by an attachment to email, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At

the request of any Party hereto or to any such agreement or instrument, each other Party hereto or thereto shall re-execute original forms thereof and deliver them to all other Parties. No Party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or an attachment to an email to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or email as a defense to the formation or enforceability of a contract and each such Party forever waives any such defense.

    **d.**  **Time is of the Essence**. Time is of the essence with respect to each Party's performance as set forth in this Agreement.

    **e.**  **Withholdings**.  All payments made or payable under this Agreement shall be subject to customary or legally required withholdings and any setoffs necessary to satisfy any debt owed by Employee to Company.

    **f.**  **Severability**.  If any court of competent jurisdiction declares any provision of this Agreement invalid or unenforceable, the remainder of the Agreement shall remain fully enforceable. To the extent that any court concludes that any provision of this Agreement is void or voidable, the court shall reform such provision(s) to render the provision(s) enforceable, but only to the extent absolutely necessary to render the provision(s) enforceable.

    **g.**  **Integration**. This Agreement and the Restrictive Covenant Agreement constitute the entire agreement of the parties and a complete merger of prior negotiations and agreements and, except as provided in the preceding subparagraph, shall not be modified by word or deed, except in a writing signed by Employee and Company.

    **h.**  **Waiver**.  No provision of this Agreement shall be deemed waived, nor shall there be an estoppel against the enforcement of any such provision, except by a writing signed by the party charged with the waiver or estoppel.  No waiver shall be deemed continuing unless specifically stated therein, and the written waiver shall operate only as to the specific term or condition waived, and not for the future or as to any act other than that specifically waived.

    **i.**  **Construction**.  Headings in this Agreement are for convenience only and shall not control the meaning of this Agreement. Whenever applicable, masculine and neutral pronouns shall equally apply to the feminine genders; the singular shall include the plural and the plural shall include the singular.  The parties have reviewed and understand this Agreement, and each has had a full opportunity to negotiate the Agreement's terms and to consult with counsel of their own choosing. Therefore, the parties expressly waive all applicable common law and statutory rules of construction that any provision of this Agreement should be construed against the agreement's drafter, and agree that this Agreement and all amendments thereto shall be construed as a whole, according to the fair meaning of the language used.

    **j.**  **Counterparts**. This Agreement may be executed in one or more counterparts, each of which when executed and delivered shall be an original, and all of which when executed shall constitute one and the same instrument.

    **k.**  **No Presumption**.  No presumption shall operate in favor of or against any party to this Agreement as a result of any responsibility that any party may have had for drafting this Agreement.

Employee:

/s/ *John Wa[ggener]*

Print Name: Joshua Waggener

Date: [●] 2-27-2023

Address: 8034 Oak Hurst Dr
Henderson, KY 42420

Hutson, Inc.:

By: /s/ *Bruce Hahn*

Print Name: Bruce L. Hahn

As its: Vice President

Date: [●] 2-27-23